UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------X
UNITED STATES OF AMERICA,

                                        MEMORANDUM AND ORDER

            -against-                        CR-00-943(S-1)

GIOVANNI SORNOZA,

                Defendant.
----------------------------X
A P P E A R A N C E S:

For the Government:
      Roslynn R. Mauskopf
      United States Attorney
      Eastern District of New York
      100 Federal Plaza
      Central Islip, New York 11722
        By: James Miskiewicz, A.U.S.A.

For Defendant:
      Thomas Liotti, Esq.
      600 Old Country Road - Suite 530
      Garden City, New York 11530

HURLEY, District Judge

            The purpose of this decision is to provide the Court's

findings of fact as to the amount of drugs attributable to

Giovanni Sornoza ("defendant" or "Giovanni")[1] for guideline

calculation purposes under U.S.S.G. § 2D1.1(a)(3).

                        INTRODUCTION

------------------------------------------

            [1] Defendant was indicted under the name Giovanni Sornoza.
The probation department indicates that his correct first name is
spelled "Jiovanny."  In the text of this opinion, he will be
referred to either as "defendant" or "Giovanni" with the latter
appellation being utilized to distinguish him from one of his co-
defendants, viz. his brother Walter Sornoza.

On October 15, 2003, defendant pleaded guilty to a lesser included offense under Count Two of the Superceding Indictment of being a member of a conspiracy, the goal of which was to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 841(b)(1)(C).[2]  The plea was taken pursuant to a plea agreement under which the "defendant stipulate[d] that his sentence should be calculated based on a drug type and quantity of at least 5.8 kilograms of heroin." Oct. 8, 2003 Plea Agreement at 3.  The defendant also agreed in the plea agreement to the following "Guidelines calculation" (id. at 2-3): "an adjusted offense level of 39 [which] carries a range of imprisonment of 292 to 365 months, assuming the defendant is in a Criminal History Category II.[3]  Id. at 2.

---

[2]  Defendant pled guilty to "knowingly and intentionally conspir[ing] to distribute and possess with the intent to distribute a substance containing heroin" under Count Two. However, defendant's activities with respect to cocaine powder and crack cocaine are properly considered in determining the base offense level as "part of the same course of conduct or common scheme or plan as to the offense of conviction."  U.S.S.G. § 1B1.3(a)(2); see also United States v. Acosta, 85 F.3d 275 (7th Cir. 1996); United States v. Young, 78 F.3d 758 (1st Cir. 1996), and United States v. Ocasio, 2004 WL 1242424 (D. Conn. June 3, 2004).  Indeed, as the facts detailed in the text infra indicate, the defendant's criminal activities involved importing and distributing all three drugs during overlapping periods of time, sometimes using the same individuals — such as Pierre Edme and Luis Guzman — to advance his intertwined heroin and cocaine operations.

[3]  The presentence report ("PSR") posits that defendant's criminal history category is a V.  PSR at ¶ 68 at p. 20.

At the commencement of the <u>Fatico</u> hearing on April 19, 2004, defense counsel indicated that his client was prepared to stand by the previously mentioned drug quantity equivalent of "5.8 kilograms of heroin." Apr. 19, 2004 Tr. at 21-22. The government then noted, however, that the plea agreement speaks of "at least" 5.8 kilograms of heroin, and indicated that it was prepared to prove that the actual amount of drugs attributable to defendant far exceeded the 5.8 kilogram figure.

Given that the statutory maximum for the count of conviction is 240 months, the parties were in agreement that, as a practical matter, the dispute involves a five month guidelines calculation differential, i.e. a range of 235 to 240 months if defendant's suggestion is adopted, or a "range" of 240 months should the government prevail at the <u>Fatico</u> hearing.[4]

A <u>Fatico</u> hearing, primarily on the issue of the amount of drugs attributable to defendant was held on April 19, May 18 and June 10, 2004.[5] At that hearing the following witnesses

_____

[4] Were the Court to impose a non-guideline sentence in the current post-<u>Booker/Fanfan</u> era, it would appear that a "precise calculation of the applicable guidelines range may not be necessary." <u>United States v. Crosby</u>, 397 F.3d 103, 112 (2d Cir. 2005). However, given that I do not know at this juncture whether a guideline or a non-guideline sentence will be imposed, coupled with the fact that we have already had a hearing on the drug quantity involved, I will render a decision on the merits.

[5] A secondary issue was also pursued at the <u>Fatico</u> hearing, and is addressed in the parties' post-hearing proposed findings

testified:

1.  Alex Rodriquez ("Rodriquez")

    a)   Testimony.  Rodriquez has known Giovanni and
Walter Sornoza ("Walter") since "like 93."  Apr. 19, 2004 Tr. at
43.  Beginning "[a]round 1996" (id. at 45), he took "four or
five" trips (id. at 49), at the request of "Giovanni or Walter"
(id. at 48, 49), to a location in Washington Heights.  The
purpose of the trips was to "[d]rop off some money and pick up
some drugs."  Id. at 48.  The money was given to him by "[e]ither
Giovanni or Walter."  Id.  The drugs, in each instance, were
cocaine[6] (id. at 129) and weighed "somewhere around a pound" (id.

---

of fact and conclusions of law, viz. whether the government has
established that the advisory guideline range should be enhanced
by 4 levels, pursuant to U.S.S.G. § 3B1.1(a) because Giovanni was
"an organizer or leader."  Simply put, the government has met its
burden of proof as to that issue.  A juxtapositioning of the
factors the Court is required to consider in making that
determination, as synopsized in Application Note 4 to § 3B1.1,
with the facts developed at the Fatico hearing compels the
conclusion that Giovanni was an organizer and leader of the Count
Two charged conspiracy.  Indeed, although such "titles . . . as
'kingpin' or 'boss' are not controlling" (A.N. 4, § 3B1.1), such
titles aptly describe his role.  That his brother arguably could
also be so labeled is not inconsistent with that conclusion.  Id.
("There can, of course, be more than one person who qualifies as
a leader or organizer of a . . . conspiracy.").  Giovanni was a
decision maker and a person who directed the criminal activities
of "five or more [other] participants (§ 3B1.1(a))," including,
among others, a number of individuals he directly or indirectly
recruited.

      [6]  Throughout this opinion, cocaine powder will be referred
to as "cocaine," and crack cocaine (or cocaine base) as "crack."

-4-

at 49).[7]

To the compound question "[a]nd when you say Walter or Giovanni, is it that you don't remember which one of them asked you, or that on some occasion it was one and on some occasions it was the other," the witness replied with an unilluminating "yes." Id. at 49-50. But to a follow-up question "was it sometimes you get a direction from Giovanni and sometimes from Walter," he responded "correct." Id. at 50. Therefore, at least one of the trips may be attributed to a direction from Giovanni.

The government then sought, unsuccessfully in the eyes of the trier of fact, to demonstrate that the two brothers, consistent with the conspiracy charge in the indictment, were working together and, thus, Giovanni is responsible for the weight involved in each of the four or five trips. See Gov't's Proposed Findings of Fact and Conclusions of Law at 3, including

---

[7] The government proffers that Rodriguez misunderstood the difference between a "pound" and a "kilogram" and meant to indicate that each pick-up involved a kilogram. Gov't's Proposed Findings of Fact and Conclusions of Law, at 4-5. That argument finds some, albeit very scant support at pages 96-97 of the transcript. Nonetheless, given Rodriguez's muddled testimony on this point, I decline to adopt the government's argument. See also Apr. 19, 2004 Tr. at 130.

Parenthetically, here, and in some other instances mentioned infra, facets of the government's proof were partially unintelligible. In each instance, the Court resolved the resulting uncertainty in favor of the defendant. This was not done via the application of the rule lenity, but rather based on the Court's conclusion that the government failed to prove that particular aspect of the subject issue.

the misguided reference to Apr. 19, 2004 Tr. at 124 (at pp. 124–
125 defense counsel's objections to questions concerning who was
"in charge" were sustained).

Rodriguez next testified that beginning in "2000, in or
around July," he had a customer, Tony, who agreed to pay him $70
a gram for heroin. Id. at 51. Giovanni agreed to supply
Rodriguez with the needed product at $66 a gram. Each time Tony
was ready to buy, Rodriguez called Giovanni who, in turn,
arranged for the requisite amount of heroin to be delivered to
Rodriguez. This happened three times, with corresponding heroin
deliveries of "200 grams" on each of the first two occasions (id.
at 55, 56), with the third consisting of "60 [or] 70" grams, plus
an additional "170 [or] 180" grams. Id. at 59–60.

Lastly, Rodriguez testified about Giovanni asking him
"to drive a friend of his to a place in Bushwick." Id. at 60.
Rodriguez knew the friend, Henry, as an associate of Giovanni
because "[h]e was the one who brought the drugs" to Rodriguez's
house with respect to Rodriguez's customer Tony. Id. at 61.
Rodriguez did as Giovanni requested. He picked up Henry at his
home in Queens and drove him to a location in Bushwick. Henry
then got out of the car and entered a building in the vicinity of
"Knickerbocker." Id. Upon Henry's return to the vehicle, he
was carrying a "brown bag full of heroin in fingers." Id. at 62.
There were about "fifty fingers." Id. From the testimony of

Pierre Edme ("Edme"), discussed _infra_, each finger typically weighed 5 to 7 grams.

b) <u>Conclusions of Fact Based on Rodriguez's Testimony</u>. I found Rodriguez to be generally credible although some portions of his testimony bordered on being unintelligible. That being said, I find that the government has established by a fair preponderance of the credible evidence[8] (1) as to the four or five trips to Washington Heights, Giovanni ordered one trip involving one pound of cocaine, (2) as to Rodriguez's customer, Tony, Giovanni supplied 630 grams of heroin (i.e. 200 grams + 200 grams + 230 grams), and (3) as to Henry, sufficient circumstantial evidence links Giovanni to Henry's trip to Bushwick and, therefore, the amount of the drugs, i.e. 250 grams of heroin (50 fingers x 5 grams each), is properly utilized in determining Giovanni's guideline range.

2. <u>Pierre Edme</u>

a) <u>Testimony</u>. Edme went to school in Brentwood with Giovanni.

In late 1998, or early 1999, Edme shared an apartment in Kendall, Florida with Luis Guzman ("Guzman"). Giovanni used to "come by" the apartment occasionally. <u>Id.</u> at 140. On two

---

[8] The fair "preponderance of evidence" standard remains the appropriate measure for <u>Fatico</u> purpose in the post-<u>Booker/Fanfan</u> era. <u>United States v. Gonzalez</u>, ____ F.3d ___, 2005 WL 1023059 (2d Cir. 2005).

occasions, Edme served as a drug courier for Giovanni. The first
trip was in February 1999. Giovanni's girlfriend, Monique Vega
("Vega"), "paid for [his] ticket" to Ecuador (id. at 146), "paid
for" the re-issuance of his expired passport (id. at 147), and,
together with "Giovanni," drove him to the airport for his
flight. Id. at 149. Upon arriving in Ecuador, he went to
Guayaquill and "met with [Giovanni's] father and uncle." Id. at
149. On the last night of his visit, Giovanni's uncle mixed
"pellets with . . . [j]ello." Id. at 150. Each pellet was about
"half the size of [Edme's] thumb" and wrapped in a fashion
intended to remain secure in his system. Id. at 151. He
swallowed "40 to 60" pellets, each weighing "from 5 to 7 grams
per pellet." Id. Edme then left Ecuador for Miami with
Giovanni's father paying for the ticket. Id. He was met at the
airport in Miami by Giovanni and Vega who thereupon took him to a
nearby hotel. Once the pellets were excreted from his body, he
called Giovanni who took possession of drugs "opened up all the
balloons and weighed them out." Id. at 153. The drugs Edme had
transported were "heroin." Id. at 145.

    In early Spring 1999, Edme again traveled to Ecuador
for Giovanni. Again, Vega paid for his transportation. This
time, however, he met both Giovanni and his father in Ecuador.
Giovanni told Edme that "they [Giovanni and his father] were
going . . . to Columbia to pick up more drugs, then to come back,

-8-

so they could make the balloons for [Edme] to ingest." Tr. at 162. When Giovanni returned, they had in their possession a package the size of a bowling ball containing "cocaine." Id. at 163. The package was opened and its contents placed into balloons, each of which was "the size of [Edme's] whole thumb," i.e. "twice the size of the first ones [he had] swallowed." Id. at 164. He was only able to swallow two of the packets, which he then transported to Miami. Giovanni, who had earlier left Ecuador, met him at the airport, took him to the hotel, and retrieved the two packets after they had been excreted from Edme's body.

Finally, Edme and Guzman transported 450 grams of heroin to a drug dealer in Detroit for Giovanni. That episode will be detailed infra in reviewing Guzman's testimony.

b)   Conclusions of Fact Based on Edme's Testimony.  Edme was a credible witness.  Based on his testimony, I find that the government has established (1) that, with respect to the first trip to Ecuador, Edme transported 250 grams of heroin for Giovanni (50 pellets at 5 ounces per pellet), and (2) as to the second trip, the corresponding weight is 20 grams of cocaine (2 pellets [each twice the size of earlier pellets] x 10 grams per pellet).

The heroin transported to Detroit by Edme and Guzman for Giovanni will be considered infra.

3.  <u>Luis Guzman</u>

    a)  <u>Testimony</u>.  Guzman met Giovanni in 1988 while both
attended school in Brentwood.  By 1996, Guzman was selling both
cocaine and crack until his arrest, together with Giovanni, at
Guzman's Islip apartment by members of the Suffolk County Police
Department on September 27th of that year.  Guzman testified that
for the four months before his arrest, i.e. from May to September
1996, he bought "250 grams [from Giovanni] every seven days."
May 28, 2004 Tr. at 187.  He identified the drug purchased as
"crack cocaine."  <u>Id.</u>  When asked if the 250 grams a week was an
"average," he said "yes."  <u>Id.</u> at 188.  He then indicated that he
never bought more than 250 grams on a weekly basis, "sometimes it
was 200" and on at least one occasion it was "100 grams" during
the subject four month period.  <u>Id.</u>  When asked to explain the
obvious inconsistency, he explained that it was 250 grams a week
"[b]ecause that's the average [he] always kept to distribute."
<u>Id.</u> at 190.  But absent from his testimony was an indication that
his inventory was totally depleted each week thereby
necessitating the weekly purchase of another 250 grams.

    The difficulty in deciphering Guzman's testimony on
this key point was not lessened during cross-examination.  On
cross, Guzman said he purchased "[c]ocaine <u>and</u> crack" in the
total amounts earlier indicated from Giovanni during the May to
September 1996 period, not just crack cocaine as testified to on

-10-

his direct.  Id. at 232; see also id. at 230.  And when asked "if
brought crack and cocaine from Giovanni . . . . [beginning] in
about 1993" he said "yes."  Id. at 230.  On re-direct, Guzman was
asked "Prior to May of 1996, did you receive some amount of drugs
you sold from Giovanni Sornoza"?  Id. at 295.  His response was
"I don't recall.  It was so long ago."  Id.

     In sum, Guzman's testimony is riddled with
inconsistencies.  Yet I believe he did buy either cocaine, crack
cocaine, or both from Giovanni on a weekly bases during the May
to September 1996 period.  To the extent uncertainty exists, and
surely it does, the imprecise character of some of the proof has
been construed against the government.  Reduced to its
essentials, I am satisfied, and so find, that Giovanni supplied
200 grams[9] of cocaine[10] to Guzman for the months of May through
September 1996.

     Additionally, Guzman testified that (1) the 16.11 grams
of crack seized at the time of his September 27, 1996 arrest was

---

     [9]  Guzman testified that he never purchased over 250 grams
from Giovanni during any given seven day period, and never less
than 100 grams.  Although his testimony about the average being
250 grams per week is obviously incorrect, his reference to that
figure suggests that the average was closer to 250 grams than 100
grams.  Accordingly, by way of what I believe to be a reasonable
estimate, I find that the average was approximately 200 grams per
week.

     [10]  The drug carrying the lesser guidelines' impact of the
two drugs under discussion.

obtained "from Giovanni Sornoza" (<u>id.</u> at 228), (2) he, with Edme, as requested by Giovanni, transported "[a]pproximately 350 grams" of "heroin" to Detroit for delivery to an associate of Giovanni's named "Jerome" (<u>id.</u> at 209), (3) he, with Edme, stopped in San Antonio on their way to Detroit, again at the direction of Giovanni, to pick up "another hundred grams" (<u>id.</u> at 212) of "heroin" (<u>id.</u>) for delivery to Jerome in Detroit; therefore the total amount of heroin delivered to Jerome was 450 grams, and (4) he, with Giovanni and at Giovanni's request, in April 1998 retrieved 750 grams of individually packaged small bags of cocaine and crack cocaine which Walter had stashed in a vacant lot prior to his incarceration; the 750 grams consisted of 400 grams of crack with the remainder being cocaine; Guzman was asked by Giovanni to sell the crack which he did; the resulting sales proceeds totaled "around $35,000" of which Guzman received $8,000" for his efforts (<u>id.</u> at 200) with the remainder going to Giovanni (<u>id.</u>); Giovanni also kept the 350 grams of cocaine (<u>id.</u> at 201).

      b)    <u>Conclusions of Fact Based on Guzman's Testimony</u>. The government has established that the following drug amount are attributable to Giovanni for guideline calculation purposes: (1) that for the period from May to September 1996, Giovanni supplied Guzman with 3440 grams of cocaine (i.e. 200 grams a week x 17.2 weeks [4 months x 4.3 weeks per month]), (2) 16.11 grams of crack

-12-

representing the amount seized at the time of Guzman's September 27, 1996 arrest, (3) 450 grams of heroin delivered to Jerome in Detroit, and (4) 750 grams of cocaine and crack (400 grams crack; 350 grams cocaine) recovered with Giovanni from the vacant lot.

4.  <u>Walter Sornoza</u>

a)  <u>Testimony</u>.  Walter was selling cocaine and crack in the 1990s.  Towards the end of the decade, Steven Seda ("Seda"), an associate of Walter's in the drug business, suggested that Walter "should try getting into the heroin business . . . [and] that [Giovanni] could provide [the] heroin."  June 10, 2004 Tr. at 8. As a result, Walter met with Giovanni in Detroit sometime in 1999.  After some initial reluctance, Giovanni agreed to furnish Walter with heroin and, in fact, sold him 100 grams during their Detroit meeting.  Weeks later, the brothers met again at a hotel near LaGuardia Airport and Giovanni provided Walter with another "hundred or 150" grams of heroin.  <u>Id.</u> at 17.

For "[f]our or five months" (<u>id.</u> at 31), measured from around mid-1999, Walter was "buying and . . . selling" about "500 grams of heroin a month, probably a little more."  <u>Id.</u> at 30.  Of that amount, he was receiving about "half" from Giovanni through Fat Jose.[11]  <u>Id.</u> at 32.

_____

[11]  The Court is satisfied that Fat Jose, as proffered by the government, "acted as a conduit [for] Giovanni."  Gov't's Proposed Findings of Fact and Conclusions of Law at 15.  Walter called Giovanni at the pager number he had previously used

b)  Conclusions of Fact Based on Walter's Testimony.

I find that the government has established that (1) Giovanni
provided 100 grams of heroin to Walter in Detroit, (2) he
provided the same amount to Walter at the hotel near LaGuardia
Airport, and (3) Giovanni is responsible for providing Walter
with 1000 grams of heroin for the four months measured from the
middle of 1999.

5.  Jean Paul Lengua ("Lengua")

a)  Testimony.  He, like a number of the other witnesses,
has known Giovanni since they attended school together in
Brentwood.

In 1998, Giovanni asked him if he knew anyone
interested in serving as a drug courier.  At the time of that
conversation, Michael Zimmerman ("Zimmerman") was also present.
Lengua and Zimmerman agreed to so serve.  Shortly thereafter,
Lengua, Zimmerman and Giovanni took a bus to Miami.  From there,
Lengua and Zimmerman traveled to Ecuador at Giovanni's expense.
After meeting with Giovanni's father, Lengua saw Zimmerman
swallow "maybe like 50" tablets (id. at 113) of "cocaine" (id. at
112) with an approximate weight of "7 grams" per tablet.  Id. at

_____

successfully to talk to his brother; Fat Jose called him back on
that number; Giovanni introduced Walter to Fat Jose previously in
Florida, and Giovanni had previously, or contemporaneously (it is
unclear from the transcript), said he, Giovanni, would provide
heroin to Walter.

113.

Lengua inserted 10 of the cocaine tablets, weighing approximately 7 grams each, in his rectum. Upon returning to Miami, Lengua and Zimmerman were met by Giovanni and taken to a nearby hotel. After the drugs were excreted, they were given to Giovanni.

Lengua also testified about Lindsey Van Kesteren ("Van Kesteren") who died prior to the hearing. Lengua was asked by Vega to make another trip to Ecuador. He agreed, whereupon he and Van Kesteren, his then girlfriend, flew to Miami and, from there, to Ecuador in the Fall of 1999. They rendezvoused with Giovanni in Ecuador. At Giovanni's request, Lengua then convinced Van Kesteren to also serve as a courier.

While they were in Ecuador, Giovanni told Lengua that part of his job was "to watch somebody that was bringing something that we were taking a trip with." Id. at 120. That "somebody" was "[s]ome guy named Tony from Ecuador." Id. Giovanni, Giovanni's daughter, Vega, Tony, Tony's girlfriend, Van Kesteren, and Lengua then flew from Ecuador to Mexico at Giovanni's expense. While in Mexico, Van Kesteren inserted "around 15" tablets of drugs into her vagina, after which she and Lengua traveled by bus to Los Angeles. Id. at 123. On cross, the witness said, however, that the number of tablets was between "10 or 15 tablets." Id. at 151. The drugs Van Kesteren smuggled

-15-

"were [later] given to Giovanni." Id. at 125.

The government asserts that the drug Van Kesteren carried was "heroin," citing the June 10th Tr. at 121-123. Gov't's Proposed Findings of Fact and Conclusions of Law at 18. Reference to the pages cited, however, indicates that Lengua was not asked, nor did he volunteer the nature of the subject tablets.

Lengua did indicate on cross-examination that the tablets that Van Kesteren smuggled were "similar," in some unspecified fashion, to the ones he had inserted into his rectum during the earlier trip with Zimmerman. Id. at 150. But that is too "thin a reed" for me to conclude that Van Kesteren transported heroin as distinct from some other drug. However, the couriers who did testify said that they, as well as the other couriers they had observed, had transported either heroin or cocaine. Therefore, it is reasonable to conclude that Van Kesteren carried one of those drugs. But which one is problematic. Since the government carries the burden of proof, which it has failed to discharge as to the particular drug she was carrying, the Court will assume that it was cocaine.

As to Tony, Lengua testified that he was told by Giovanni that the drug smuggled by Tony was "heroin." Id. at 126. He also testified that he was "pretty sure" that Giovanni said he paid Tony "like around $10,000" for his services. Id.

-16-

Finally, Lengua testified about another trip to Ecuador that he "arrange[d]" at Giovanni's direction. Id. at 128. Among those who were to serve as couriers were Angie Stevenson ("Stevenson") and Zimmerman. Those two made the trip to Ecuador, with Lengua and his friend, James Reyes, remaining stateside.

After Stevenson returned from Ecuador, she provided the drugs she had smuggled to Lengua. The drugs were packaged in a "cylinder." Id. at 132. Giovanni told him the drugs were "heroin." Id. When Lengua was asked if he knew "the weight of [the] cylinder," he answered "no." Id.

b)    Court Declines to Accept Government's Arguments Regarding Amount of Drugs Purportedly Transported by Tony and Stevenson. The Court recognizes that drug computations for guideline purpose need not be made with mathematical certainty. Rather, reasonable estimates based on the information available will suffice. The operative term, of course, is "reasonable," recognizing the effect such calculations may have on the period of incarceration faced by a defendant.

The Court declines to adopt the weights proffered by the government as to couriers Tony and Stevenson. Gov't's Proposed Findings of Fact and Conclusions of Law at 19-20. However, I do accept Lengua's testimony that Giovanni identified the drugs carried by both as heroin. Id. at 125-26, and at 132 respectively. We also know from Lengua that Giovanni paid Tony

around $10,000 for his courier services, and that Stevenson actually transported the heroin since "she gave [the cylinder housing the drugs]" to the witness upon her return to Long Island. Id. What remains to be determined is the amount of the drugs.

As to Tony, the government argues:

Although Sornoza did not tell Lengua how much heroin Tony was smuggling, Sornoza did say that he paid Tony approximately $10,000 for his services. 6/10 Tr. 126. During that same trip, in which Van Kesteren smuggled only 70 to 105 grams of heroin, Lengua testified that Sornoza paid him $3,000. 6/10 Tr. 155. Assuming Van Kesteren and Lengua were paid this sum for smuggling the smaller (i.e., 70 grams) estimated amount of heroin, and assuming too some proportionality with respect to the amount smuggled and fee paid to the courier, this testimony circumstantially supports a finding that the courier Tony had smuggled in a far greater quantity of heroin in September 1999-more than three times the amount brought in by Van Kesteren.

Gov't's Proposed Findings of Fact and Conclusions at 19.

The Court does not accept the government's methodology. There are too many unknown variables. Tony smuggled heroin; what Van Kesteren transported is unclear from the record. Is the price of transport the same for heroin and cocaine? Did Tony move the drugs from Ecuador to Mexico and then into the United States, or only from Mexico to the United States like Van Kesteren? Lengua accepted, apparently as compensation for Van

-18-

Kesteren's services, the sum unilaterally determined by Giovanni;

was the $10,000 provided to Tony similarly determined or was it

the product of negotiation?

The evidence indicates that Tony smuggled heroin for

Giovanni.  But I am unable on the information furnished to

estimate the amount absent rank speculation.  Accordingly, no

weight will be assigned to Tony.

The government's position on Stevenson is as follows:

> Sornoza told Lengua that Stevenson had
> smuggled heroin into the United States.  6/10
> Tr. 132.  Given Lengua's description of the
> method of this particular smuggling effort,
> coupled with his earlier testimony regarding
> Van Kesteren, the government submits that the
> evidence supports a finding that Stevenson
> smuggled at least 70 grams of heroin on that
> trip on behalf of the defendant Giovanni
> Sornoza.

Gov't's Proposed Findings of Fact and Conclusions of Law at 20.

Van Kesteren and Stevenson both smuggled drugs in their

vaginas.  However, it appears that Van Kesteren inserted a series

of separate tablets into her vagina whereas the drugs carried by

Stevenson were packaged somehow into a single cylinder.  There is

no evidence indicating that one method or the other permits a

greater quantity, all other things being equal, to be carried.

Seemingly, however, there would be a difference of some sort.

And presumably not all individuals, even if of the same sex,

share the same carrying capacity.  Accordingly, the Court

declines to adopt the 70 gram figure proffered by the government. But given that at least a somewhat similar means of transport was utilized by both female couriers, the Court feels comfortable estimating — giving the benefit of the doubt to Giovanni — that Stevenson carried fifty percent, i.e 35 grams, of what Van Kesteren transported.

     c)  <u>Conclusions Based on Lengua's Testimony</u>.  The government has established through this witness that (1) Zimmerman transported 350 grams of cocaine (50 tablets x 7 grams each), (2) Lengua transported 70 grams of cocaine (10 tablets x 7 grams each), (3) Van Kesteren transported 70 grams of cocaine (10 tablets x 7 grams each) and (4) Stevenson transported 35 grams of heroin, i.e. half the quantity of drugs carried by Van Kesteren.

<u>CONCLUSION</u>

     The above constitutes the Court's findings of fact as to the amount of drugs chargeable to Giovanni for guideline calculation purposes under U.S.S.G § 2D1.1(a)(3).

     The government is directed to furnish a copy of this memorandum to the Probation Officer assigned to this case so that he may recompute the "Base Offense Level" (Dec. 16, 2003 PSR at ¶ 51) consistent with the Court's findings.  In that regard, the Probation Officer may find it helpful to focus upon numbered paragraphs 1(b), 2(b), 3(b), 4(b) and 5(c), in which I have synopsized my drug quantity findings based on the testimony of

each of the witnesses who testified at the <u>Fatico</u> hearing.

The <u>Fatico</u> hearing shall continue, through to the pronouncement of sentence, on June 1, 2005, beginning at 10:00 a.m.

SO ORDERED.

Dated: May 11 , 2005
       Central Islip, New York


_____/S/_____
                 DENIS R. HURLEY, U.S.D.J.